[Cite as *King v. Miami Cty. Bd. of Commrs.*, 2018-Ohio-3810.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY**

|  |  |  |
|---|---|---|
| IN THE MATTER OF THE APPEAL OF THE CHILDREN'S HOME COUNTY DITCH, PETITIONED FOR BY RICHARD W. KING | : : : : | Appellate Case No. 2017-CA-32 |
|  | : | Trial Court Case No. 2014-CV-262 |
| RICHARD W. KING, et al. | : |  |
|  | : | (Civil Appeal from |
| Appellants | : | Common Pleas Court) |
|  | : |  |
| v. | : |  |
|  | : |  |
| MIAMI COUNTY OHIO BOARD OF COUNTY COMMISSIONERS, et al. |  |  |
| Appellees |  |  |

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of September, 2018.

. . . . . . . . . .

GREGORY R. FLAX, Atty. Reg. No. 0081206, 500 North Fountain Avenue, P.O. Box 1488, Springfield, Ohio 45501
        Attorney for Appellants

CHRISTOPHER L. ENGLERT, Atty. Reg. No. 0063829, 201 West Main Street, Troy, Ohio 45373
        Attorney for Appellees, Miami County Board of Commissioners, et al.

DAVID C. BARRETT, JR., Atty. Reg. No. 0017273 and AMANDA STACY HARTMAN,

Atty. Reg. No. 0087893, 7259 Sawmill Road, Dublin, Ohio 43016
   Attorney for Appellees, Robert & Jill Benham, Trustees

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the December 20, 2017 Notice of Appeal of Richard W. and Vicki E. King. The Kings appeal from the November 30, 2017 judgment of the Miami County Court of Common Pleas, which upheld the decision of the Miami County Board of Commissioners ("Board") dismissing the Kings' petition for the improvement or replacement of the Children's Home drainage tile pursuant to R.C. 6131.04. Since the decision of the trial court was not against the manifest weight of the evidence, we hereby affirm the decision of the trial court.

{¶ 2} On September 16, 2013, the Kings filed a petition for improvement or replacement of the Children's Home drainage tile.[1] The petition requested that the Board "replace, locate, clean, remove obstructions from, construct, reconstruct, straighten, deepen, widen, and/or alter the Children's Home Drainage Tile, from Lefevre Road to Pleasant Run." The petition identified multiple landowners "to be benefitted" by the project.

{¶ 3} A public hearing on the petition was held on January 7, 2014, and on May 1, 2014, the Board issued a resolution. In Resolution 14-05-574, the Board determined as follows:

   RESOLVED, by the Board of Miami County Commissioners, that

---

[1] A "drainage tile" is alternately referred to by the parties to these proceedings and their witnesses as a "watershed," "drainage ditch," "ditch," or "tile." All of these terms refer to a system of underground tiles or pipes, along with other components, that drain and convey water.

said petition be and it hereby is dismissed on the ground and on the basis of the finding of the Board that the proposed improvement, when reviewed with consideration of the fact that the proposed improvement is incident to an existing public ditch which, in its present condition, is of use and retains beneficial effect, and, therefore, that said improvement is not necessary at the present time; and further on the ground and on the basis of the finding of the Board that, in further consideration of the existence and residual beneficial effect of the existing ditch, at this time, the cost of the proposed improvement will exceed the benefits to be derived if it is constructed; and authorizing and directing the Clerk of the Board of County Commissioners of Miami County, Ohio to journalize the resolution upon the official journal of the Board, and to effect notice to interested owners and participating legal counsel of the adoption and entry of this Resolution * * *

{¶ 4} The Kings appealed the Board's decision to the court of common pleas, and a de novo bench trial occurred on August 4-6, 2015. The court heard the testimony of 12 witnesses.

{¶ 5} Petitioner Richard King testified that he resides in Sugarcreek Township, where he owns 120 acres, 100 of which are tillable. King stated that Coy Hiegel, who is the grandson of Don Hiegel, farms his property, and that Jay Benham previously farmed the property from 1980 to 2012. He stated that he grows soy beans and corn alternatively on the property. King stated that he experiences "very significant drainage problems" on the farm; water runs from the north to the south on his property, and the main drainage conveyance, the Children's Home tile, was "broken." According to King,

99 percent of the water on his property comes from "the Benham farm" to the north of his property. King stated that the tile was cracked and "of no value to serve its purpose."

{¶ 6} King identified Plaintiff's Exhibit 4 as an email he sent to the Miami County Engineer's Office; it contained photographs of his property taken by him in April 2014, depicting water in a field. King stated that a "steady stream of water just has to seek its own direction and * * * will back up and overflow during rains and during heavy times." King testified that once the water leaves his property, it proceeds to the south to the "Gish farm."

{¶ 7} King identified Plaintiff's Exhibit 6 as several photographs taken by him in July 2015. One photograph depicted a hole filled with water in the ground, and King testified that there were several such holes on his property caused "by pressure from all the way south." King stated that another photograph depicting a grassy area reflected "the desperate need of * * * the farm to be tiled and the amount of land that's not being utilized for crop because * * * of the lack of drainage." He stated that there was 15-inch tile on his property. King stated that the flooding and lack of drainage had hurt his crop growth. He stated that the grassy area was 30 to 40 feet wide and was "not functioning now by any means." King stated that "once we get this approved, then we'll go to the Soil and Water Conservation District and * * * replace this grass waterway and upgrade * * * that part of the farm."

{¶ 8} According to King, another photo in the exhibit depicted corn, which he described as "[d]warfted (sic) plants because of too much water." Another photo depicted "[c]rops in bad need of drainage." King testified that the final two photographs in Plaintiff's Exhibit 6 depicted a common problem, namely "crops are flooded, can't grow

* * *. Won't * * * reach maturity. It's a very significant problem and * * * it's a wide area." King identified a photo of his western field, and he stated, "there's usually a lake there" of an acre and a half to two acres that was "not going to grow anything." King also identified a photo in Plaintiff's Exhibit 7 depicting a broken tile and debris. He testified, "instead of replacing one tile, we end up replacing maybe twelve, sixteen feet of it, because each tile is cracked." King stated that, from 2005 to 2013, he spent $6,856.48 on repairing the tile, and he identified an "Accounting QuickReport" prepared by him reflecting his expenses. He stated that in total he had spent over $13,000.00 on the tile going back beyond 2005. When asked if the repairs solved the problems, he replied, "it's just a bandage on a major, major problem."

{¶ 9} King stated that in 1983 he "systematically" tiled 17 acres on his property; at the time, Jay Benham was farming the property. King stated that he relied upon Benham's guidance since he (King) was "really * * * not a farmer." He identified Plaintiff's Exhibit 16 as a map of the tiling system that was installed in 1983. King stated that the new system was connected to the Children's Home tile, and that he chose an eight inch tile for the project. King stated that the new system was "not effective at all."

{¶ 10} When asked why he did not replace the tile on his property at his own expense, King stated that it would be a major expense, and his property was not the source of the water. According to King, three farmers share his situation, and two farmers "with the springs" on their properties were opposed to the repairs. King stated that all "the people in the watershed had a vote and their votes were based on or counted based on the number of acres they have." King stated the "the ones with the springs have the majority of the acres. The ones without the springs, we didn't have enough votes."

He stated that the Benhams' and Dennis Clark's properties contain springs.

{¶ 11} King identified as Plaintiff's Exhibit 8 "the report from the County Engineer that was given to the Commissioners justifying replacing the watershed tile." King stated that the Engineer's Office was "very supportive of the project" and determined that the benefits would outweigh the cost. He acknowledged that replacing the tile in its entirety would be expensive, and he stated that he was willing to pay his share.

{¶ 12} On cross-examination by counsel for the Benhams, King stated that he did not live in the watershed, although he and his family had planned to move there, but "with all of the activity, the negative, I wouldn't submit my family to that and harm them." King stated that he did not personally farm his land, and that his contract with Benham to do so lasted over 30 years. King stated that he terminated his contract with Benham over Benham's opposition to replacing the Children's Home ditch. He stated that he terminated the contract in "in 2012, but the contract continued into March [2013]."

{¶ 13} King testified that he had not made any repairs since 2013, because, "[y]ou make a repair, and it goes out elsewhere it's just – it's a continual problem." King stated that a large portion of the tile was close to the surface, that some of the tile was on limestone, and that digging through the limestone could substantially increase the cost of the project. King identified Defendant's Exhibit B16 as correspondence he received in 1998 from the Miami Soil and Water Conservation District ("MSWCD") indicating in part that "we found a concrete tile, flowing very fast," on his property. King stated that he had "never seen concrete tile and as far as I know, it's not functioning."

{¶ 14} Dan Baker, a deputy engineer at the Miami County Engineer's Office, testified that he was experienced in agricultural drainage. He testified that there were

"twenty ditches that the Miami County Engineer's Office oversees the maintenance on." Baker stated that the "Children's home tile is a petition ditch of record, originally constructed in 1921, I believe. Since it was constructed prior to August 23rd 1957 there's no maintenance on that tile system as far as the County Engineer's Office is involved." He stated that the ditch was constructed of "tile, which could be clay tile or vitrified tile." Baker stated that the outlet for the tile was "on the Gish property near the open ditch for the tile outlets." When asked how many acres were drained by the Children's Home tile, Baker stated that "it's a 440 acre plus watershed." He stated that the water flowed in "a southerly direction" and that 10 to 15 landowners have property in the watershed. He stated that the Benhams' property was "located in the northern portion of the watershed," that the Kings, Hiegels, and Gishes also owned property in the watershed, and that if the drainage tile worked properly, all the owners would obtain a benefit therefrom.

{¶ 15} Baker testified that he "reviewed the Children's Home tile related to the petition filed through the Commissioner's Office, [and] the site was also visited leading up [to] the petition that was filed with the Soil and Water office." Baker stated that if the project had been approved, the County Engineer would have had maintenance responsibilities upon completion. Based upon his observations of the tile, he concluded that it "was in a failed or failing state." According to Baker, there were "areas where the tile system had collapsed and there was blow holes. There was water standing and running over the surface directly over or adjacent to the existing tile main, [and] * * * the tile was exposed, cracks and quartering of the tile." He testified that on "the lower end of the property, the failed or failing tiles [were] causing water to stand. * * * [T]hat will cause the ground to be extremely wet. * * * The failing tile will also create holes where the

tile will collapse and the soil will go down into the tile system. That was also observed."

{¶ 16} Baker stated that on the Gishes' property, "there was erosion over the top of the tile." Baker identified multiple documents in Plaintiff's Exhibit 13 as "a complete copy of the original Children's Home tile" from 1921, which in part documented the "beginning, route and termini" of the ditch. Baker testified that the "benefitting owners within the watershed" paid for the Children's Home tile when it was installed in 1921. He testified that the drainage tile "began at the south edge of LeFevre Road, generally in [a] southerly direction, across * * * - now the King property, across the Gish property and outleted * * * into the open ditch." Baker stated that records indicate that a portion of the tile was reconstructed in the 1940s on what is now the Kings' farm. He stated that the records reflect that the repair started on the property line of what is now the Kings' property and went north approximately 700 feet. Baker stated that the tile on the Kings' farm runs substantially longer than 700 feet.

{¶ 17} Regarding the evaluation of Kings' petition, Baker testified that Joint Exhibit 26 was "our work log," which reflected the individual hours worked on the Children's Home project by the Engineer's Office. Between October 24, 2013, and March 25, 2014, Baker worked 134.75 hours evaluating the Children's Home tile and the petition. Baker identified Plaintiff's Exhibit 8 as the Engineer's report and attachments that his office submitted to the Board. He stated that at the preliminary hearing before the Board, the Engineer's Office submitted a proposal for replacement of the tile. He stated that the "project was to begin on the north side of LeFevre Road" with a 15 inch tile. Baker testified as follows:

> As the tile progressed downstream, through the King property and

* * * through the Gish property, the tile sizes were increased accordingly based on the acres draining into it. Also included in the project, well there's many things included. Abandonment of the existing main, connections to any laterals encountered. There were two tile spurs included in the project. Tree and brush removal on portions of the project and based on the records we had from Soil and Water, there was open ditch cleanout included on the project also. * * * [I]n the event construction methods [were] required, there were ancillary items * * * included in the estimate that may not have been constructed, but to be conservative, they were included. Such as an access road.

{¶ 18} Baker stated that he obtained the "sizing spreadsheet" from MSWCD, to determine the size of tile to install "based on the number acres being drained at each point where a subwatershed enters. * * * We also took into consideration that our records said that the tile underneath LeFevre Road was a fifteen inch existing tile." The following exchange occurred:

Q. In the course of preparing the Engineer's report, did you or the Engineer's Office evaluate the benefits that the reconstructed tile will have to the landowners in the watershed?

A. Yes.

Q. * * * [W]hat did your office conclude?

A. Our – our report showed that benefits exceeded costs four to one.

Q. Did you do an evaluation with respect to each landowner in the

watershed, as to what their benefits would be?

A. Yes.

{¶ 19} Baker directed the court's attention to Attachment A of Plaintiff's Exhibit 8. Baker testified that Table A-2 of the Exhibit identifies each parcel's individual benefits, including "living space, sanitary systems benefits, public roadway, agricultural productivity and property enhancements." Baker testified that the benefit to all of the parcels in the watershed totaled $823,111.00. He stated that the total benefit to the Benham property was "$269,600 and some odd dollars," and that the "calculation showed that the * * * Benham property had the highest total benefit." Baker testified that the cost to replace the Children's Home drainage tile was $173,042.48. He identified the "Tile Main Preliminary Estimate Sheet," the "Spur Two Preliminary Estimate Sheet," and the "Spur Three Preliminary Estimate Sheet" for the project in Attachment A. Baker testified that the estimates contained items that may not be necessary. He stated that "we did not consider utilizing any of the existing Children's Home tile because of its age, site observation and experience with trying to utilize tile systems of that age."

{¶ 20} Baker testified that if the project had been approved, "the County Engineer would have been ordered by the Commissioners to prepare plans, surveys, specifications, [and] assessments * * * for the construction of the improvement." Baker testified that it was necessary to replace the existing tile.

{¶ 21} Baker stated that counsel for the Benhams opposed the project at the hearing, asserting that the cost outweighed the benefits and that the Engineer's Office made miscalculations. Baker stated that the Engineer's Office subsequently reduced the agricultural benefit by "about twenty percent." Baker stated that at "the time this report

was prepared, there were no other indications of any other outlet * * * for Mr. King's property. * * * [T]he records our office had indicated that his property was served by the Children's Home tile constructed in 1921."

{¶ 22} Baker testified that he prepared an estimate of the cost to each individual landowner "to install their own tile outlet sized only for draining the acreage they owned," and he stated that "the cost of each owner to install their own tile main would exceed the estimated petition project by sixty-five percent or $78,654," with the exception of the Gish property, which "has direct access to outlet [its] own field tile into the existing open ditch." Baker identified as Plaintiff's Exhibit 9 a "Work Session 02/19/14," which reflected the increase. Baker testified that Plaintiff's Exhibit 9 further reflected that Benham installed tile without a permit on his property, potentially in violation of R.C. 5589.06. According to Plaintiff's Exhibit 9, "Spur #3 is necessary to connect an existing field tile Mr. Benham installed without a permit * * *. The tile installed by Mr. Benham discharges subsurface water into the existing road-side ditch, creating wet, soggy, and un-maintainable conditions along Lefevre Road, within the road right-of-way."

{¶ 23} On cross-examination by counsel for the Benhams, Baker testified that he did not consider any benefits from the existing tile system in his calculations. When asked if the benefits could have been "overstated," Baker replied, "If you take into consideration that there's an existing tile functioning at some level, yes." Baker identified Defendant's Exhibit B40 as his handwritten notes for the project, one of which provided: "Therefore the benefits are calculated at 100%, not considering the partial functionality of the existing tiles."

{¶ 24} Counsel for the Benhams noted that Baker's report "does not assume that

the land is systematically tiled" by the farmers "so they can take advantage of the main." Baker responded that "many soil types in Miami County require tiling of some nature," and that "we don't have those records for each parcel. But our belief is that for * * * the ground to be in agricultural production, they would have had some level of tiling." Baker stated that he did not know what it would cost for the watershed to be systematically tiled. Baker stated that he obtained the estimated crop yield increase for each soil type for the corn, wheat, soybean and hay in Table A-7 in his report from the "soils survey in Miami County," and that he did not have an independent opinion as to how the actual yields would be achieved. Baker stated that the new drainage tile would operate as a conduit. He stated that if limestone were encountered in installing the tile, it "would cost more to excavate limestone or bedrock than it does soil." After reviewing Defendant's Exhibit B16, Baker stated that he had not investigated whether concrete tile existed on the Kings' farm, and that further investigation was needed. He stated that if the project were to be approved, "we certainly would have had to do some further investigation to determine what we have to work with and some of the site conditions also." Baker acknowledged that, on Joint Exhibit 26, his hours on the project were reduced by 50% to account for other work duties he performed independent of the tile project.

{¶ 25} Paul Huelskamp testified that he was a professional engineer, serving as the elected County Engineer in Miami County. He stated that he made a visual inspection of the Children's Home drainage tile in the course of the petition process. Huelskamp "observed the tile that was breaking down in various locations. Had broken down at the lower end quite extensively. Through Mr. King's property, it was breaking down consecutively down through the * * * lower field that he had and on up toward his

pasture field towards the north end of the property." Huelskamp testified that he observed standing water and erosion on the Kings' property. Huelskamp also observed the tile on the Gishes' property, where "it's nearly gone. I mean, * * * there's literally nothing left * * * on most of Mr. Gish's property. The – where the tile had been was overgrown with trees and brush * * *."

{¶ 26} Huelskamp stated that upon receipt of the petition, "we're required to issue a report in accordance with Section 6131 and present it to the Commissioners." He identified Plaintiff's Exhibit 8 as the report that he compiled with Baker. Huelskamp testified that the Children's Home tile was in need of replacement. He testified that he and Baker "were aware that there had been repairs previously made to the tile. And the * * * state of disrepair that we saw when were out there indicated that further repair would probably be cost prohibitive and that * * * we were at * * * a point where complete replacement was the best alternative, based on my preliminary report and what we saw in the view." Huelskamp stated that he proposed using corrugated plastic pipe to replace the broken clay tile. He stated that the collapsing clay tile needed to be replaced due to its age. Huelskamp stated that the benefits of replacing the tile outweighed the cost. According to Huelskamp, increased crop production would be "the majority of the benefits that we calculated for the project," by "using the soil survey of Miami County, as well as information from the United States Department of Agriculture." Huelskamp acknowledged that some landowners within the watershed did not have agricultural production on their property, but he testified that they would receive benefits "for their septic system, for their property, for property enhancement to eliminate standing water, as well as outlets * * * for subsurface drainage where they had basements."

**{¶ 27}** To determine the cost of replacing the tile, Huelskamp testified that he "used current process that we had on hand for most of that information. Dan [Baker] calculated that using information that he had. And then he and I, as with most of the report, he did the majority of the * * * first draft of it and then he and I would get together and * * * fine-tuned the report as it was developed." Huelskamp stated that Baker worked under his direction and supervision. He stated that "we had $173,000 of the costs and we had $823,000 in benefits." He stated that his benefits totals included conservative reductions and that the cost included replacement of all of the tile from LeFevre Road to the outlet at the Gish property, as well as the construction of two spurs.

**{¶ 28}** Huelskamp testified that he responded to the criticisms of his report after the hearing, and he identified Plaintiff's Exhibit 9, the "Work Session 02/19/14," as "our response to questions that were asked of us following the hearing." Huelskamp testified that he reviewed his calculations and again concluded that the ditch needed to be replaced and that the cost did not exceed the benefits. Consistent with Baker's testimony, Huelskamp testified that if the project had been approved, he would have done further evaluations of the tile, developed plans and specifications for the project, and evaluated the tile to determine what needed to be replaced and if anything could be saved. Had the petition not been dismissed, Huelskamp would have done "a more in depth study, possibly some excavation, some of the points that have been brought up by * * * all of the parties have indicated that there was some repairs made that could be utilized." Huelskamp testified that he had "no idea * * * without looking whether or not different facilities could be used or not used. I would likely rely heavily on the property owners if they made repairs that they thought could be utilized. Of course, that would cut

down on the cost of the project for everyone in the watershed" if the repairs previously made could be utilized.

{¶ 29} Huelskamp testified that the project would be paid for "by assessments * * * to the * * * benefitting property owners"; his office would maintain the new tile "with the maintenance fund that we would set up and each benefitting property owner would receive an assessment on their taxes every year for maintenance."

{¶ 30} On cross-examination by counsel for the Benhams, Huelskamp testified that he observed a "breather" on the Children's Home ditch along LeFevre Road, where water freely flowed through it without obstruction. Consistent with Baker, Huelskamp testified that, in his cost-benefit analysis, he did not consider the functionality of the existing tile or any benefits therefrom received by the landowners. He stated that he considered the land in the watershed to be "undrained" in his calculations, and he acknowledged that the benefits he calculated could be overstated. Huelskamp acknowledged that, for some landowners, the new tile would only act as a conduit for water. He testified that on the Kings' farm, if the new conduit were installed, "and it is a slotted conduit, it will act also to * * * drain the ground immediately adjacent to the conduit." When asked if landowners would need to install systematic tiling on their farms in order to "obtain a hundred percent of the benefits from this new tile," Huelskamp responded negatively. He testified that "there is systematic tiling on a portion of Mr. King's farm," and that "there could be other tiling, targeted tiling, most likely instead of what we refer to as gridiron systematic tiling * * *  that run off that existing tile on Mr. King and Mr. Gish as well." Huelskamp testified that he believed "something around 14" out of the 440 acres were currently systematically tiled in the watershed.

{¶ 31} Huelskamp testified that it costs between $750 and $900 an acre to install a systematic gridiron type of tile, and that those costs were not included in his estimate. He stated that he relied on the information from the MSWCD for his benefit analysis, and that he had no expertise in forecasting crop prices or crop yields. Huelskamp testified that he projected an increase yield of 28.57 bushels per acre for corn. The following exchange occurred:

Q. * * * [W]ould you expect to get 28.57 bushels per acre increase just by putting this new main in without doing any additional work?

A. I – I –I can't say. Each – each land, you know – that's why we used averages and the like, I mean, all land is different. So, I mean, this is supposed to be an average. So, I guess, one could expect that. I don't know if – if I would necessarily bank on that.

Q. There are a lot of factors that determine yield, right?

A. Right.

Q. And even in this watershed, not every landowner may see a 28.57 yield increase per acre of corn, right?

A. Well, but you have to have something to go off of. So we used the best information that we had, which is the information that we had from the soil survey. I mean I have to come up with a cost benefit analysis and part of that cost benefit analysis is yield. * * *

Q. * * * But you would agree not everybody's going to achieve that, correct?

A. Well, not - I don't know that everyone will. Some could be

higher, some could be lower.  I don't – I don't know.  I mean, it also depends on what kind of year you have.   I mean, there's so many different factors, but in the end I have to come up with a hard number for cost benefit analysis.   So I have to use something and - and this is the best information that we have to use.

Q.  And you would agree it also depends on what other tile those farmers have out there directing their water to the new main, correct?

A.  Yes.

**{¶ 32}** Huelskamp testified that he had not completed a cost-benefit analysis on a ditch petition prior to the Children's Home project.   He testified that he employed reduction factors to his estimates, and that "if I had to do it again, we wouldn't do that. * * * We would have just run a number straight and * * * whatever came out is what came out.   Again, we were just trying to be conservative."   Huelskamp testified that he was not familiar with the depth of the soil in the watershed in relation to limestone.   He testified that a 15-inch tile should be installed roughly four and a half feet below the ground, and that if limestone were encountered, the tile may cost more to install, since "[e]xcavation of rock is much more difficult than excavation of soil."   The following exchange occurred:

Q.  So it would require the use of special tools, equipment, etcetera?

A.  Right.   And if - if that were to happen, we would likely look at, and this would be part of our analysis when we were coming up with plans and specifications, we may look at some different design alternatives. Obviously, if you go to two tiles instead of one, there's an increase cost of material, but there would be a decreased cost in excavation, because you

wouldn't have to go the full depth of the – of the fifteen inch. Maybe we'll go to two tens or something like that and reanalyze and so there could be different factors that come into play.

Q. Would that increase the costs of running a second main?

A. Of course.

Q. Would you agree that if you installed that new main * * * in too shallow of a depth it may lead to potential damage of that new tile?

A. Yes.

Q. Would you agree that if that tile isn't installed, you know, due to bedrock or whatever things you encounter, you're not able to install that main as deep as you need to, could that affect the ability and the effectiveness of a farmer trying to systematically tile?

A. Yes.

Q. Your cost benefit analysis did not include any additional costs for these - in the event you were to encounter bedrock or limestone?

A. Well, we * * * did include ten percent contingencies. But there was nothing in particular that was included for bedrock or limestone.

{¶ 33} When shown Defendant's Exhibit B16, the 1998 letter indicating the presence of concrete tile on the Kings' property, Huelskamp testified that he did not consider that there could be a second concrete main on the Kings' property. With respect to Defendant's Exhibit B18, which depicted a map of the installation of tile across the Kings' property by Nick Mott (one of the Kings' neighbors) and bore a stamp that read "Received Nov 01 2013 Miami County Engineers," Huelskamp testified that the map was

part of the Engineer's Office records, but that he had not seen the map until trial. When asked if the Motts "were able to connect into the clay tile or whether they connected to * * * another main running across" the Kings' property," Huelskamp responded, "I have no idea." He testified, "I know what I saw when we were out there and did the view. I have no idea of the condition of this other tile. This concrete tile that was installed whenever – or whatever else is out there." Finally, Huelskamp testified that, in the event that a "second main" exists on the Kings' property, he would have to further investigate whether completing the project on the Gishes' property to open the outlet would be sufficient to allow the Kings' tile to function properly.

{¶ 34} On re-direct examination, Huelskamp testified that the existing tile was not functioning and it was "cutting a gulley down through Mr. King's property," such that "repairs just don't get it anymore and it's – it's time for replacement. * * *And that's my, you know, my knee jerk assessment of the preliminary report." He stated that the Benhams' and Clarks' properties were significantly higher than the Kings' and Gishes' properties, and that when the water encounters an obstruction in the lower properties, it "blows out the tile." Huelskamp testified that it was never suggested to him during the petition process that there was a second concrete main running across the Kings' property, and that he did not observe one. Huelskamp testified that if there were concrete tile on the Kings' property, it would likely have been installed in the 1940s or 1950s, "based on the material type." The following exchange occurred:

Q. If there is some other concrete tile on * * * Mr. King's property, based on your observations, is it resolving the flooding and erosion problem on his property?

A.   No, it's not.

Q.   Is it resolving any of the problems on Mr. Gish's property?

A.   No.

Q.   Are you aware of any reason that the Board of Supervisors for Soil and Water Conservation Office denied the petition * * * other than lack of support from the owners who own the majority of the acres in the watershed?

A.   That was the reason that was given at the hearing.

{¶ 35} On recross-examination, Huelskamp testified that any benefit the landowners received from the existing system was "to the detriment of Mr. King." He stated that he was not aware that "Soil and Water" recommended the installation of a "grass waterway" in the area of the tile on the Kings' property, and that "we didn't run numbers for that of course, but based on the viewing, * * * the installation of a grass waterway would seem appropriate. As I mentioned before, we didn't get to the design portion of the – the petition."

{¶ 36} Kreig Smail testified that he was the District Administrator with the MSWCD and was involved with the Kings' petition. Smail stated that he made visual inspections of the Children's Home ditch on the King and Gish properties. He testified that there were "several holes" where the "tile has collapsed. It starts to absorb the soil, the erosion, standing water in certain areas * * *." Smail testified that "water was bubbling up out of a section of the tile. Running on top of the ground and making its way to another section downstream." During one visit to the property in May 2013, Smail stated that crops were planted around a large area containing "blow holes" in the tile, and "[y]ou just

physically couldn't plant at that area."

{¶ 37} On cross-examination by counsel for the Benhams, Smail stated that if the drainage tile sought in the Kings' petition were installed, the landowners "would either have to have what's considered pattern tiling or laterals, submains, something of that nature to hook into that or it may already be there existing." Smail stated that in the course of the cost-benefit analysis, those additional costs to landowners had not been considered. He stated that he did not know how many acres in the watershed were currently systematically tiled or had pattern tile in them. Smail testified that limestone could be encountered during the installation of the tile by landowners if they tried to connect to the replaced tile, and that it could impact their ability to systematically tile in the watershed. When asked if the cost was factored into the estimate, Smail responded that "if you were to look at the costs, estimated costs, there is a contingency that's ten percent of the project. That's for anything such as that." He acknowledged that if limestone were to be encountered, the cost could exceed ten percent.

{¶ 38} Smail testified that he was not aware of the presence of a concrete tile on the Kings' property. He testified that "if it's out there, it's still not operational enough for the watershed." Smail stated that if he found an existing tile it could possibly be incorporated into the project. He testified that the tile on the Gish property had not been maintained.

{¶ 39} On cross-examination by Dennis Clark, Smail testified that "we assume that there has to be either something existing or something installed to get a hundred percent of the benefit." When asked if the cost-benefit analysis could be incorrect due to the additional potential costs, he responded, "it can be depending on what is there or what is

not there. See we don't know that." Smail stated that "it's not a hundred percent correct to say that everyone still has to spend additional money because they may or may not," but "[s]ome will." When asked if the cost to benefit ratio were "a guess," Smail responded, "it's not a hundred percent per every * * * landowner, no."

{¶ 40} On redirect examination, Smail stated that the age of the tile and tree roots downstream were the main cause of the deterioration of the tile. On recross-examination, when asked if solely removing the trees and brush on the Gish property would improve drainage, Smail replied, "I do not know that."

{¶ 41} Paul Chester testified that he was an agricultural engineer, with his own consulting firm, having retired from the Natural Resources Conservation Service after 30 years. He stated that he was the area engineer for northwest Ohio, covering 20 counties, while at NRCS. He stated that a "good part of [his] responsibilities were to review and design engineering drawings for designing subsurface drainage mains." Chester stated that he visited the Children's Home tile site with King and "walked the entire project on Mr. King's property and viewed the * * * existing tile and the problems there." He stated the tile "in general of that age, was very badly deteriorated. In my opinion, * * * does need replacement." Chester identified Plaintiff's Exhibit 17 as a report he prepared regarding the tile. He stated that the tile needed to be replaced in its entirety, and that "it badly cracks and when you attempt to try to repair it, you only damage other tile that [is] supposedly in good shape." Chester testified that when "tile get to ninety or a hundred years old they have outlived their life."

{¶ 42} On cross-examination by counsel for the Benhams, Chester testified that the reports he reviewed treated the watershed as undrained land. He stated that while

some landowners received benefits from the existing system, those benefits were not considered in the cost-benefit analysis. He acknowledged that in order to receive 100 percent of the benefits from the proposed new system, the landowners must have systematic tile, and if they did not currently have systematic tiling, they would incur additional costs which were not included in the cost-benefit analysis. He stated that many factors aside from drainage affect crop yields. According to Chester, if "you get into the agronomic side, which I am not an expert on, * * * there are many, many other things that impact" crop yield. However, he stated that Ohio State University and the USDA had "many studies that have proven the benefits of having subsurface drainage on a system and the expected yield benefits from that."

{¶ 43} Regarding the possible presence of limestone in the watershed, Chester testified that a "lot of times that limestone can be very soft and you can just use a * * * dozer with a plow on the back of it and rip it and take care of that, which would be minimal expense. But you would try to go around it if possible." Chester testified that he had not observed concrete tile on the Kings' property. After reviewing Defendant's Exhibit B16, Chester testified that when he inspected the property, he was "not aware that there possibly was a second tile, even at the outlet end," and did not investigate it. He stated that the potential presence of a second functioning tile would not change his opinion on the project because the tile would have possibly been installed in 1944, and he would not "leave an old, seventy year old tile, in the middle of a new, good system that we're going to put in. So I would recommend removal of anything that would exist down there, whether it be concrete from '44 of the old clay from '21."

{¶ 44} Donald Hiegel testified that he owns property on State Route 41 in the

watershed served by the Children's Home ditch, namely 20 acres immediately east of the King farm, between the King farm and the Clark farm. He stated that he had owned the land for 28 years, having farmed it for almost 30 years for Eugene Harman previously. Hiegel stated that he grows corn and soy beans in "flip flop rotation." Hiegel stated that when he "started farming in 1960, I farmed the Scott farm, which is now the King farm," and that his grandson, Coy, now farms the Kings' farm. He identified Plaintiff's Exhibit 6 as photos taken by counsel for the Kings in his presence, and he testified consistently with King about the conditions of the farm and crops in the area of the tile. Hiegel stated that he was in favor of replacing the Children's Home tile. He testified that "you patch one and the next one falls in. And * * * with the weight of machinery today, it needs to be probably * * * deeper, more cover than what this tile originally had on it." Hiegel stated that "it would be futile to just keep patching it." He stated that the Clark and Benham properties have springs.

{¶ 45} Philip Gish testified that he owns 91 acres in the watershed serviced by the Children's Home ditch, having purchased it from the county in 1973. He stated that he experiences drainage problems; the "main tile goes through my property and it's broken down. It's pretty well been described – it's overgrown, it's got a lot of water impediment. There's water on top. It's finding its own route. It's getting worse every year." Gish testified that photo number KING000435 in Plaintiff's Exhibit 6, which depicted water on the surface of the land, was representative of the conditions on his property. Gish testified that the water "bypassed the tile entirely." Gish stated that he had three or four acres on his property that he cannot farm due to the water, and that the "water is no longer feeding into a tile, it's coming out on top of the ground." Gish testified that he supported

replacing the tile. Gish stated that none of his property was systematically tiled. When asked if he opposed an open ditch on his property, Gish responded, "don't have the expertise to make an assessment about what should be there." When asked if he could clear the brush on his property, Gish responded that he "could have."

{¶ 46} Jay Benham testified that he was a full time farmer and owned 220 acres, 141.7 of which were in the watershed. Benham stated that he had also farmed the King farm in the past, but he no longer did so "because I wouldn't vote for the tile project." Benham testified that the project was "unnecessary." He stated that when the water leaves his property in the tile "the tile is only half full" and functioning. He further testified that the project would "put undue expense on a lot of elderly people that live in this watershed that will not benefit one penny." According to Benham, "the cost of this far exceeds the benefit." Benham stated the project would not make a difference to the yields on his property, since the system was working already, "unless we put in systemic tiling, which would cost another hundred and some thousand dollars, which will also increase the cost." Benham stated that water drains off his property without restriction.

{¶ 47} Benham testified that he observed water flowing freely through the "breather" from his property to the Kings' property, and that the area had an exceptional amount of rainfall between June 15, 2015 and July 15, 2015. Benham stated that he had not observed any water backing up on his property. He stated that the water drains from his property because there was "a functioning tile. And it's downhill. Water runs downhill."

{¶ 48} Benham testified that he received two copies of Defendant's B16, and he stated that the letter was significant because it indicated that "there are two main tile

running close to one another" on the Kings' farm. Benham testified that he had encountered limestone in the watershed. Benham stated that Plaintiff's Exhibit 8 did not accurately portray the cost and benefits of the project. He stated that "they start out assuming there's a swamp. Zero production and then at the other end, they assume that we all have systematic clay tile and [are] getting a hundred percent of the tile benefits." He testified that replacing the tile would not "make much difference at all unless we systematically tile our farms to increase our yields." Benham testified that he had maintained his tile while others in the watershed had not.

{¶ 49} The Benhams next called Dennis Clark to testify. Clark stated that he was a life-long farmer, and that he owned 98 acres, the majority of which was in the Children's Home watershed. Clark testified that he started farming his property in 2008. He testified that "my water, basically, flows down a southwesterly fashion and across the Hiegel farm into the * * * Children's Home ditch at the junction of Hiegel's and Gish's." Clark testified that he did not support the Kings' petition, since the "system is not totally disabled. It is still functioning to a percent." Clark testified that water drains off his farm without restriction. He stated that every "year we fix a tile, a blowout hole here or there. It's just part of farming."

{¶ 50} Clark stated that he had not installed any systematic tiling on his property and that he did not "have the funds available to do that now." He said it costs $750 to $900 per acre, and "if I have 90 acres in this watershed, that's over $80,000.00." Clark stated that he would "need to systematically tile * * * to reap one hundred percent of the benefits from this project." He stated that he believed Plaintiff's Exhibit 10 overstated the benefits of the project. He testified that he did not believe that he would see the projected

yield increases because "they're not going to systematically tile my field in that figure." Clark testified that there were "too many factors involved in a yield," such as weed control, fertility, planting dates, harvest dates, varieties, insect pressure, weed pressure, mother nature. The tile is just one feature of that equation." Clark further stated that Plaintiff's Exhibit 8 inaccurately projected the cost and benefits of the project, and that systematic tiling will "greatly increase the cost of the project." Clark testified that his septic system was 17 feet away from the tile and would not benefit from the new tile. He stated that he did not believe the new system was necessary. Clark stated that the outlet on the Gish property needed to be opened up "so we can see what we have to work with," and that "that will benefit everybody on the watershed, the outlet through the Gish property needs to be addressed."

{¶ 51} Art Brate, a professional engineer with over 40 years of experience, testified that his experience working with agricultural drainage and ditch petitions prepared him to offer opinions about the Children's Home ditch petition. He testified that he had previously been deemed an expert witness, and the court designated Brate as an expert witness in this case. Brate testified that he attended the County Commissioners' "viewing" of the Children's Home ditch. Brate observed water flowing through the "breather." Brate identified Defendant's Exhibit 22 as the expert report he prepared. He testified that to a reasonable degree of engineering certainty, the proposed improvement was not necessary, and that its cost exceeded its benefits.

{¶ 52} Brate testified that Defendant's Exhibit B16 "talks about a concrete tile," and if "we were going to do repairs, this has to be considered"; "we need to do some more investigation of where this concrete tile is." He testified that "[y]ou have to have an

adequate outlet for whatever you might be going to do," and "we don't have a good outlet." According to Brate, the "old tile that goes down the Gish property that's overgrown with the trees, roots, it – for sure that has to be opened up * * * to give us a good outlet before any of this other kind of work could be justified."

**{¶ 53}** Brate testified that the proposed access road on the project, at a cost of $6,650, was excessive. He identified Defendant's Exhibit B25 as his correspondence with Dan Baker regarding the proposed access road; it also addressed a five percent maintenance assessment for the first year, which Brate testified was high. Brate further testified that the $10,000 cost to remove the trees and brush from the Gish property "is usually a direct assessment to that landowner" rather than being "spread out over the entire watershed." He stated that "to get those [projected] benefits means the landowners spending a whole lot of money on their own properties putting in systematic drainage." Brate stated that "getting these laterals in at the proper depth and spacing may be difficult to do" due to the presence of limestone and bedrock. Brate testified that the proposed system was "the conduit that you tap everything into," and "it's not systematic itself." Brate testified that the cost of installing systematic drainage "ranges $700 or $800 easily per acre," and he was "not sure the [entire] 440 acres would lend itself to complete systematic due to shallowness, the bedrock or just the grades and things like that." According to Brate, the watershed could easily have a higher cost than projected, based on "the soils and kind of topography." Brate testified that the county engineer and MSWCD "based their comparison on the benefits if it was systematically drained, the entire watershed and we know it isn't." He stated that "if you added that cost to the overall project * * * it would change that ratio quite a bit." Brate testified that the projected

benefits were based on "440 acres being systematically drained and we know that's not the case." He stated that the engineer and MSWCD did not assign any value to the existing system, and "there is a system in place that's providing some definite benefits already."

{¶ 54} The Benhams next called Jack Estey to testify. Estey stated that he was a retired excavating contractor and that he had completed work at the Children's Home ditch for the Kings and Benhams. He identified Defendant's Exhibit B17, a handwritten document on "Estey Excavating" letterhead, which reflected work performed on the Kings' property from November 15-20, 2012. Estey testified that he installed "a new tile to drain Mr. Mott's yard" and ran new plastic tile into concrete tile. He stated that the concrete tile was "in really good shape. It looked almost new. It was that clean and it was - being a one inch thick cement tile, I was surprised hitting it, because I was expecting a clay tile." He identified Defendant's Exhibits B19 and 20 as photos of the concrete tile and the hole he cut into it to connect the plastic tile. On cross-examination, Estey stated that King gave him permission to come across his property with the tile.

{¶ 55} Finally, the Board called Board President John Evans to testify. Evans stated that he observed the "breather" on the Kings' property by LeFevre Road in November 2013 in the course of the on-site visit, and that water was flowing through it. He stated that he observed "several holes that had been blown out * * * and some tile pieces in the field" on the Kings' property. Evans stated that the first hearing on the petition was on January 7, 2014, at which time Huelskamp presented a preliminary report to the Board. Evans testified that the public responses to the report were "non-supportive." He identified Joint Exhibit 244 as the Board's May 1, 2014 resolution of the petition. Evans

testified that "we were concerned that there was not credit given for an existing drainage system * * *. And we felt that because it was operating that it should have been figured in and it was not to our estimation." On cross-examination, Evans stated that the decision to dismiss the petition was unanimous. He testified that he participated in a work session on February 19, 2014 with Huelskamp and Baker to respond to the criticisms of the preliminary report.

{¶ 56} After the hearing, on August 19, 2015, the court ordered the parties to submit proposed findings of fact and conclusions of law. The Benhams, the Kings, and Board did so on September 14, 2015.

{¶ 57} The trial court made findings of fact, including the following:

14. The commissioner's held a first hearing on the proposed improvement on January 7, 2014. At the first hearing, Paul Huelskamp * * * provided his report in favor of the petition to replace the Children's Home Drainage Tile. Huelskamp's report included a required cost benefit analysis of the proposed improvement to the Children's Home Project. Huelskamp candidly acknowledged the limitations in his report and in the analysis. Huelskamp acknowledge[d] that he had no previous experience in performing a cost benefit analysis in relation to a ditch petition. In addition, in analyzing the necessity, costs, and benefits of the proposed improvement, Huelskamp did not consider any benefits landowners currently derive from the existing Children's Home Drainage Tile. Landowners in the watershed still derive benefits from the existing Children's Home Drainage Tile.

15. In analyzing the necessity, costs, and benefits of the proposed improvement, the Engineer considered all of the acreage in the watershed to be undrained land. However, the land in the watershed was not undrained as the Children's Home Drainage Tile still acts to drain the lands in the watershed. Almost all of the land in the watershed is farmed and planted in crops to be harvested at the time of trial herein.

16. Huelskamp also did not consider the existence and functionality of the concrete main tile extending across Appellants' property, and therefore he necessarily overestimated the benefits to be derived from the proposed improvement. Huelskamp acknowledged that he did not know about the concrete drain when he analyzed the necessity of the proposed improvement. He said that additional investigation would be needed to determine the effect of the concrete drain on the extent and necessity of the proposed improvement.

17. The cost benefit analysis also assumed that all farmland drainage in the watershed would be categorized as "good drainage" following the completion of the proposed project. However, the watershed will not be completely and wholly drained upon installation of the proposed improvement. To be considered completely drained, the land must be tiled with systematic drainage tile or other tiling. Systematic drainage tile refers to the installation of drainage tiles at an established distance apart over a specified area. Currently, approximately 10 percent of the 440 acres in the watershed have been tiled with systematic drainage tile.

18. Installing systematic drainage tile is not likely to be practical throughout the watershed due to the shallow depth of limestone, and the increased costs of installing systematic drainage tile through limestone. There were no plans to install systematic drainage tile throughout the watershed.

19. Shallow limestone, large rocks, and natural springs are common in the watershed. Encountering shallow limestone during installation of the proposed improvement could significantly increase installation costs, the costs of the proposed amendment.

20. Drainage in the watershed could be improved by providing a clear outlet for the Children's Home Drainage Tile, a project of much smaller scale and cost. A large majority of landowners in the watershed opposed the petition and submitted comments to the Commissioners voicing their opposition. The Commissioners received comments from 19 landowners opposing the proposed improvement, and comments from only 3 landowners in favor of the proposed improvement.

{¶ 58} The trial court concluded that "the appellants have not demonstrated by a preponderance of the evidence that the costs of construction of the improvement will probably not exceed the expected benefits."

{¶ 59} The Kings assert three assignments of error herein which we will consider together. They assert:

THE TRIAL COURT ERRED BY CONCLUDING, IN THE JUDGMENT ENTRY DATED NOVEMBER 30, 2017, THAT APPELLANTS

DID NOT DEMONSTRATE THAT THE COST OF REPLACING THE CHILDREN'S HOME TILE WILL PROBABLY NOT EXCEED THE EXPECTED BENEFITS.

THE TRIAL COURT ERRED BY DISMISSING APPELLANT'S PETITION.

THE TRIAL COURT ERRED BY CONCLUDING, IN THE FACE OF OVERWHELIMG EVIDENCE TO THE CONTRARY, THAT THE BENEFITS OF THE CHILDREN'S HOME TILE WILL NOT OUTWEIGH THE COSTS.

{¶ 60} The Kings assert that they were "suffering flooding, erosion, crop losses, and other damages to their farm" from the "dilapidated" Children's Home drainage tile. They argue that replacement of the tile "is necessary, will be conducive to the public welfare, and will cost less than the expected benefits." The Kings direct our attention to Plaintiff's Exhibit 10, the preliminary report of the MSWCD, and King's, Hiegel's and Gish's trial testimony, and they argue that as a result of the tile's deterioration, they are experiencing very significant drainage problems on their farm. The Kings assert that Benham "concedes that portions of the Children's Home tile across the King and Gish properties are broken down and in a state of disrepair." The Kings assert that Clark "admits the absence of an adequate drainage outlet is preventing him from systematically tiling his farm." The Kings direct our attention to Huelskamp's testimony that the tile was carrying water to their detriment, and to the testimony of Chester that the tile had exceeded its useful life.

{¶ 61} The Kings argue that Huelskamp and MSWCD correctly concluded that "the benefits of the improvement will substantially exceed the cost," and neither the Board

nor any other party "prepared an alternate cost-benefit analysis with respect to the Proposed Improvement."  Citing Chester's report, the Kings assert that "the calculated benefits of the Proposed Improvement still outweigh the costs by a ratio of 2.5 to 1 even if the expense of systematically tiling the entire watershed is included in the cost-benefit analysis."  Citing Exhibit 9, the Kings assert that "[a]ccording to the County Engineer, the cost for the owner of one of the five large agricultural properties in the watershed to install his 'own tile main would exceed the estimated petition project [cost] by 65%.' "

{¶ 62} The Kings argue that the causes of the existing system's failure, such as lack of maintenance and the level of landowner support, were not relevant factors pursuant to R.C. 6131.01, and that "the decision to approve, or disapprove, a ditch project should not denigrate into a popularity contest or an exercise in finger pointing."  The Kings note that Huelskamp "never wavered in his assertion that the benefits of the project will outweigh the costs," and that he "insisted that the cost of systematically tiling the entire watershed should not be included in the cost-benefit analysis."  Citing Plaintiff's Exhibit 9, for example, the Kings assert that "in response to the suggestion that landowners will not realize all of the benefits of the Proposed Improvement without systematically tiling their properties, Mr. Huelskamp explained: '[w]ithout a clear and sufficient outlet, no benefit would be received from systematically tiling property.' "

{¶ 63} The Kings note that no witness "could testify from personal knowledge as to the existence of the possible second main or its location," and they assert that the concrete tile encountered by Estey was likely "the portion of the Children's Home Tile that was replaced pursuant to the 1944 petition; rather than a second main."  The Kings assert that Huelskamp "aptly noted that the possible second main, if it exists, is not

resolving the flooding and erosion issues on the King and Gish farms."

{¶ 64} The Kings argue that the "trial court's conclusion that Appellants did not establish, by a preponderance of the evidence, that the benefits of the proposed improvement will not exceed the costs is against the manifest weight of the evidence at trial, and contrary to the expert opinions expressed by the County Engineer, the Administrator of the [MSWCD], and private engineer Paul Chester." According to the Kings, the "trial court's determination is not supported by substantial, competent, and credible evidence and should be reversed."

{¶ 65} The Kings note the court "simply dismissed Appellant's petition rather than modifying the scale or scope of the project. Notably, Appellant's petition suggested several alternatives to complete replacement of the Tile. * * * It was the County Engineer who selected complete replacement as the best alternative." The Kings argue that the "trial court abused its discretion by dismissing [their] petition in its entirety rather than evaluating the alternative prayers for relief (*e.g.*, repair or partial replacement) presented therein." According to the Kings, in "the interest of judicial efficiency, the trial court could have modified the route, termini, or mode of construction, or adjourned the proceeding and ordered the County Engineer to perform further investigation or develop alternative plans." They assert that, by dismissing the petition, the trial court sent them "back to square one; leaving them a choice between pursuing this appeal or filing a new petition with the County Commissioners."

{¶ 66} The Benhams assert that the cost of replacing the Children's Home tile would exceed any benefits received, and that the "testimony presented at the trial could not have been interpreted in any other way." The Benhams assert that the "only

propert[ies] that could potentially benefit from the proposed improvement will be the {Kings'} Property, the Gish Property, and the Hiegel Property, as the Benham Property is already draining." The Benhams argue that the Kings' and Gishes' properties "will see more benefit than any other landowner[s] in the watershed because they have not made repairs on their property and have allowed trees and brush to overgrow more so than any other landowners in the watershed." The Benhams assert that they "will see no change to how water currently drains from their property if the proposed improvement [were] done." The Benhams argue that the Kings "want all the landowners to pay for the benefits that only [they] will receive," and that "the Proposed Improvement is incredibly expensive."

{¶ 67} The Benhams assert that Huelskamp and MSWCD, "when determining their cost benefit analysis, did not consider all necessary factors"; "their benefits were calculated from one hundred percent of the watershed going from not being drained to being completely drained. * * * That is simply not correct; the whole watershed will not be drained solely because of the proposed improvement." The Benhams argue that "in order to receive the benefits from the Children's Home Drainage Tile, the landowners will need to install additional systematic tiling on their propert[ies]" in order for the water from their properties to reach the Children's Home drainage tile. According to the Benhams, adding "systematic tiling to the approximately 440 acres in the watershed would be a very expensive project, costing each landowner several hundreds of dollars per acre." The Benhams further argue that an "additional expense that was not taken into consideration in any of the cost-benefit analyses is the presence of limestone in the Children's Home Drainage Tile watershed. * * * [T]hose that have farmed and worked in the watershed

know that limestone is very prevalent in the area."

{¶ 68} The Benhams assert that the projected crop yields do "not appear to be an accurate calculation. No one involved in making this calculation has any expertise in predicting crop prices." The Benhams note that "witnesses acknowledge that there were factors other than drainage that must be considered when forecasting crop yields. * * * In the cost benefit analysis, however, the only factor considered when showing a large per acre increase was sufficient drainage." They assert that "where landowners have adequate drainage and the Children's Home Drainage Tile is functioning properly, there cannot realistically be an expected increase in crop yields from drainage alone."

{¶ 69} According to the Benhams, an "additional mistake in the Engineer's cost-benefit analysis was that no weight was given to the fact that there is a large existing concrete tile that goes through" the Kings' property. The Benhams argue that it "appears the concrete main is still functioning and should have been considered in the cost-benefit analysis."

{¶ 70} The Benhams further argue that when the Kings systematically tiled 17.9 acres outside of the watershed and tied into the Children's Home drainage tile, they caused "an increased burden on this tile. * * * [They] have caused issues with the Children's Home Drainage Tile, but want other landowners in the watershed to pay for their self-inflicted problems." The Benhams note that the Kings had not made any repairs to the tile on their property since 2013, and that Mr. Gish had "not performed maintenance on the Children's Home drainage tile, as he incorrectly believed that it was not his responsibility as the landowner." According to the Benhams, the Children's Home drainage tile was in the worst condition on the Gish property, because of the owners'

failure to perform the necessary maintenance and upkeep.

{¶ 71} The Benhams assert, in contrast, that they have "repaired the tile on their property to the benefit of the entire watershed"; prior to 2013, when Mr. Benham was still farming the Kings' property, Mr. Benham performed repairs on the Kings' property and "helped maintain the functionality" of the Children's Home drainage tile. The Benhams argue that while a significant portion of the expense for the proposed improvement would be "solely from clearing brush and debris from the Gish Property," the "expense is added to the total cost of the Proposed Improvement, and evenly distributed across all property owners, rather than charged to the Gish Property specifically." According to the Benhams, other landowners in the watershed were incurring greater expenses because of the lack of maintenance and repairs performed by the Gishes, while these other landowners have used their own funds to maintain and repair the Children's Home Drainage Tile to the benefit of everyone in the watershed."

{¶ 72} Finally, the Benhams argue that the court properly dismissed the Kings' petition, and the suggestion that the trial court "could have modified the Petitioned Improvement and approved a different project is incorrect." According to the Benhams, if the Kings "decided that they should have petitioned for a different improvement, they could have filed another petition with the Commissioners. Instead, they chose to appeal to the Court of Common Pleas, and then to this Court."

{¶ 73} In its brief, the Board asserts that the "evidence support[ed] Judge Gee's findings that the benefits derived from replacement of the Children's Home Ditch were overstated in the Engineer's report while its costs were understated." The Board argues that Brate "was the only expert actually qualified as an expert witness by Judge Gee

during the trial"; he opined that parts of the Children's Home tile were functioning and "thus, the improvement as proposed was not necessary." The Board notes that, according to Brate, there appeared to be concrete pipe running across the Kings' property that seemed to be in good condition, and as such, there was "actually a second, concrete drainage tile main on the King Property." According to the Board, there was sufficient competent and credible evidence supporting Judge Gee's finding that there was a concrete tile crossing the Kings' property, "which provided an additional drainage benefit to the watershed," as well as his finding that the Children's Home tile was "still functioning at some level." The Board argues the trial court "properly found that both tile systems provide a benefit to the landowners within the watershed that was not reflected in the Engineer's Report."

{¶ 74} The Board asserts that the trial court's findings that landowners would be required to systematically tile their properties to receive the projected benefits, and that such tiling "is not likely to be practical" "due to the presence of limestone and the increased costs of the tiling," were "ultimately fatal to the petition."

{¶ 75} Like the Benhams, the Board notes that multiple factors affecting crop yield were not reflected in Huelskamp's analysis. The Board asserts that neither R.C. 6131.09 nor any other Ohio Revised Code section requires the Board or the court to follow the recommendation of the County Engineer.

{¶ 76} The Board asserts that the Kings' second assignment of error "must also be overruled as Judge Gee was not required to revise the scope of the petition and grant a petition of a smaller scope." The Board argues that R.C. 6131.25 did not authorize Judge Gee to modify the petition and approve a project of "a different scope" than that

originally sought," based on the evidence presented.

{¶ 77} In reply, the Kings argue that the Board and the trial court "wrongly attribute[d] the failure of the Children's Home Tile to lack of maintenance by [the Kings] and other landowners." The Kings direct our attention to Plaintiffs' Exhibit 10, which provided that the tile had "deteriorated," and to Chester's testimony that the tile had outlived its useful life. According to the Kings, "[f]ingerpointing simply distracts from the core criteria for approving a ditch petition."

{¶ 78} The Kings further assert that the Board and the trial court "wrongly suggest that it is local custom for landowners to repair the [drainage] tiles across their properties." They argue that such a "suggestion is belied by the very existence of Chapters 6131 and 6137 of the Revised Code, which establish a mechanism for constructing, repairing, maintaining, and/or replacing drainage improvements at the shared expense of all landowners in a watershed." The Kings note that the Children's Home tile was initially constructed, and a portion was replaced in 1944, "at the shared expense of landowners in the watershed." The Kings argue that the fact that the Benhams maintain the tile on their property "should have had no bearing on the trial court's determination," since those repairs "provide no benefit to downstream landowners." The Kings direct our attention to R.C. 6131.01(F).

{¶ 79} The Kings assert that Huelskamp's report "was 'very thorough and detailed' and Appellees never put forth any meaningful alternative to his cost-benefit analysis." The Kings argue that Huelskamp's "estimates, statements, and opinions are within his area of expertise and should be afforded some level of deference." According to the Kings, instead "of squarely attacking the Engineer's report, Appellees nibbled

around the edges, suggesting the Engineer overestimated various benefits or underestimated various costs." The Kings argue that the "criticisms leveled by Appellees, even if valid, are not material."

**{¶ 80}** Finally, the Kings argue that "the exactitude demanded by Appellees and the trial court, with respect to the Engineer's cost-benefit analysis, [was] neither fair nor warranted" by R.C. 6131.09. According to the Kings, there "is no support for the trial court's conclusion that benefits of the drainage improvement will not outweigh the costs – beyond the court's generalized concerns about overstated benefits and understated costs."

**{¶ 81}** We consider the Kings' assigned errors to assert that the judgment of the trial court was against the manifest weight of the evidence. This Court has previously noted:

" '[I]n order for an appellate court to reverse a decision as against the manifest weight of the evidence in a civil context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.' " *Brewer v. Dick Lavy Farms, L.L.C*, 2016-Ohio-4577, 67 N.E.3d 196, ¶ 46 (2d Dist.), quoting *Alh Properties, P.L.L. v. Procare Automotive Serv. Solutions, L.L.C.,* 9th Dist. Summit No. 20991, 2002-Ohio-4246, ¶ 12. " '[M]anifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion * * *." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19.

"In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Id.* "Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re Starks*, 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 15, quoting Black's Law Dictionary (6th Ed.1998) 1182.

"In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21. When determining whether the judgment below is against the manifest weight of the evidence " ' "every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." ' " *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978). " ' "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." ' " *Id.*

*Mitchell v. Brownie's Indep. Transm.*, 2d Montgomery No. 27563, 2018-Ohio- 32, ¶ 29-31.

{¶ 82} By way of background, R.C. 6131.04 governs petitions such as the one at

issue herein and provides, in relevant part:

Any owner may file a petition with the clerk of the board of county commissioners of the county in which is located a part of the land that is averred to be benefited by the construction of a proposed improvement. The petition shall state that the construction of the improvement is necessary, will benefit the petitioner, and will be conducive to the public welfare; shall state the nature of the work petitioned for; and may ask to locate, clean, remove obstructions from, construct, reconstruct, straighten, deepen, widen, alter, box, tile, fill, wall, or arch any ditch, drain, watercourse, floodway, creek, run, or river or to change the course, location, or terminus thereof, * * *. The petition shall state the course and termini of the proposed improvement and the branches, spurs, or laterals, if any are petitioned for. Except as ordered under section 6131.31 of the Revised Code, the petition shall state that all costs of engineering, construction, and future maintenance will be assessed to the benefiting parcels of land. * * *

{¶ 83} R.C. 6131.07 governs notice and hearing, and R.C. 6131.09 governs the county engineer's preliminary report. R.C. 6131.09 provides:

When notified of the filing of a petition authorized by section 6131.04 of the Revised Code, the county engineer shall prepare a preliminary estimate of the cost of the proposed improvement. The engineer shall file at the first hearing, as a guide to the commissioners and the petitioners, a preliminary report including his preliminary estimate of cost, his comment on feasibility of the project, and a statement of his opinion as to whether

benefits from the project are likely to exceed the estimated cost. The preliminary report shall list all factors apparent to the engineer, both favorable and unfavorable to the proposed improvement, so that the petitioners may be informed as to what is involved. In addition to reporting on the improvement as petitioned, the engineer may submit alternate proposals to accomplish the prayer of the petition. The county commissioners may require the county engineer to file any additional preliminary reports, of whatever nature, that in the opinion of the board will serve as a guide to the board and the petitioners in deciding whether to proceed with the proposed improvement.   * * *

{¶ 84} R.C. 6131.11 governs a finding against the proposed improvement and provides:

> If the board of county commissioners, at the first hearing, finds that a proposed improvement is not necessary, or finds that a proposed improvement will not be conducive to the public welfare, or finds that the estimated cost of a proposed improvement will exceed the benefits to be derived if it is constructed, the board shall dismiss the petition and enter its findings upon its journal. Any owner who is affected by the order of dismissal may appeal to the court of common pleas of the county in which the petition was filed, as provided in sections 6131.12 to 6131.64 of the Revised Code.

{¶ 85} Finally, R.C. 6131.25 governs questions that may be appealed and provides in relevant part:

> Any affected owner may appeal to the court of common pleas within

twenty-one days of the date that any order was issued by the board of county commissioners, as provided in sections 6131.01 to 6131.64 of the Revised Code, and may appeal any one or more of the following questions:

(A) Is the improvement necessary?

(B) Will the improvement be conducive to the public welfare?

(C) Is the cost of the improvement greater than the benefits conferred?

(D) Is the route, termini, or mode of construction the best to accomplish the purpose of the improvement?

(E) Are the assessments levied according to benefits?

(F) Is the award for compensation or damages just?

**{¶ 86}** R.C. 6131.30 governs procedure on appeal. It provides:

The court of common pleas, on appeal, shall hear the matters appealed de novo. The proceedings shall be conducted under the rules of law and procedure for civil cases. An appeal shall bring into the court all the owners who in any way may be interested in or affected by the matter appealed. The court, exercising equitable jurisdiction, shall hear all matters appealed, except an appeal from an order allowing or refusing to allow compensation or damages. The court may view the premises the same as views in other civil cases and shall make such judgment, order, or decree as is warranted by the evidence. Any owner aggrieved by the judgment, order, or decree may appeal for a review of the proceedings, the same as in other civil cases. On appeal, the burden of proof shall be on the owner

having the affirmative of the proposition, who shall have the opening and closing. The court, exercising equitable jurisdiction, shall bring the entire proceedings before it in order to determine all the issues raised in the proceedings and enter a final judgment, order, or decree for or against the improvement petitioned for and for or against the assessments to be levied and the compensation and damages to be paid.

**{¶ 87}** R.C. 6131.31 governs the trial court's finding on appeal and provides in relevant part:

(A) If the appeal is from an order of the board of county commissioners made at the first hearing dismissing the petition, and if the court of common pleas from the evidence adduced, including the county engineer's preliminary estimate of cost and preliminary report on feasibility of the project, but without a survey having been made by the county engineer and without any of the schedules, plans, or reports having been filed by the engineer, finds that the construction of the improvement is not necessary or will not be conducive to the public welfare or that the cost will probably exceed the benefits, the court need not order a survey of the improvement, shall find against the improvement, and shall dismiss the petition therefor. The costs before the board shall be paid by the petitioner. The cost in the court shall be paid by the appellant.

**{¶ 88}** Having thoroughly reviewed the record herein, we conclude that the trial court correctly determined that "the appellants have not demonstrated by a preponderance of the evidence that the costs of construction of the improvement will

probably not exceed the expected benefits," and it properly dismissed the petition. In other words, the decision of the trial court was not against the manifest weight of the evidence.

{¶ 89} While there was testimony that portions of the Children's Home drainage tile were failing and needed to be replaced, testimony revealed that it was the long-standing practice in the watershed that individual landowners repaired and maintained the drainage tiles. The Kings stopped doing so after they terminated their contract with Benham, and the Gishes did not maintain their property.

{¶ 90} We further note that Huelskamp's and Baker's calculation of the cost-benefit analysis to replace the tile was somewhat speculative and failed to establish that the cost would not outweigh the benefits. Huelskamp, who was inexperienced in performing cost-benefit analyses on ditch petitions, did not consider any benefit received by the landowners from the existing tile and considered the watershed undrained, despite having viewed the "breather" with water flowing in an unobstructed manner in a portion of the watershed. While Baker testified that Benham would receive the greatest benefit from the project, Benham testified that his property already drains without obstruction. Huelskamp further testified he did not include the cost, at $750 - $900 an acre, to install systematic tiling, which Clark testified he could afford. King himself, as well as Baker, Huelskamp, and Smail, acknowledged that the presence of limestone in the watershed could substantially increase the cost of the replacement project. Huelskamp testified that the replacement tile should be installed four and a half feet into the ground, but he was not familiar with the depth of the soil in the watershed in relation to the limestone.

{¶ 91} Baker testified that "ancillary items," such as an access road, were included in the project, though they might not be needed. Baker acknowledged that the benefits

may have been overstated in his calculations, and that he "assumed" that once new systematic tile was installed, there would be 100 percent efficiency. While Huelskamp testified that the major benefit conferred by the project would be increased crop production, he acknowledged that some landowners in the watershed did not grow crops. He further testified that multiple factors affect crop yield besides drainage. While Huelskamp testified that he had employed reduction factors to his estimates, he further testified that "if I had to do it again, we wouldn't do that." Huelskamp did not consider the presence of a concrete drain on the Kings' property, which Estey observed and testified was "in really good shape" and "looked almost new." Huelskamp stated that, if a second concrete main exists on the Kings' property, he would have to investigate whether opening the outlet on the Gishes' property would be sufficient to allow the Kings' tile to function property. Huelskamp himself described his preliminary report as "my knee jerk assessment."

{¶ 92} Smail also testified that the benefits may be overstated "depending on what is there or what is not there. See we don't know that." While he testified that the age of the tile and the tree roots downstream were the main causes of the deterioration, when asked if removing the trees on the Gish property would improve drainage, Smail responded, "I do not know that." Chester testified that, to achieve the projected benefits, the landowners must have systematic tile, and that installing the tile would increase the costs of the project.

{¶ 93} The only witness who was recognized and designated as an expert, Brate, opined that the cost of the project exceeded its benefits. He testified that the cost of the proposed access road was excessive, and that the five percent maintenance assessment

was high. Brate testified that the projected benefits were based upon the watershed being systematically drained, that systematic drainage was necessary to receive the projected benefits, and that he was unsure whether the watershed lends itself "to complete systematic drainage due to shallowness, the bedrock, or just the grades." Brate testified that the replacement main was designed to operate as a conduit, or channel, and was not systematic itself.

{¶ 94} As noted above, the trial court had the opportunity to observe all the witnesses and assess their knowledge and credibility. The court clearly found the testimony of expert witness Brate and of Benham, an experienced, full-time famer who repaired tile on the Kings' property for 30 years, more persuasive than the testimony of King, who did not farm his property in the watershed, Huelskamp, who lacked experience with ditch petitions when he prepared his cost-benefit analysis, and Hiegel and Gish. We defer to the trial court's assessment of credibility. Having reviewed the entire record, we cannot conclude that the trial court lost its way in determining that the Kings failed to establish that the benefits of improving the Children's Home drainage tile would exceed the cost of the project. The Kings' assignments of error lack merit, and they are accordingly overruled. The judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, J. and HALL, J., concur.


Copies sent to:

Gregory R. Flax

Christopher L. Englert
David C. Barrett, Jr.
Amanda Stacy Hartman
Donald & Patricia Hiegel
Gary & Kimberly Seitz
Nick & Darlene Mott
United States of America
David & Elizabeth Dickey
Denise Gibson
Dennis & Cheryl Clark
Dennis Rife
Dwayne & Mona Taylor
John Gates
Orvin Reynolds
Phil & Mary Ellen Gish
Hon. Christopher Gee